UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

IN RE:

CROOKED CREEK CORP.                          Chapter 12

    Debtor.                          Bankruptcy No. 09-02352S

---

CROOKED CREEK CORP.

    Plaintiff

vs.                                          Adversary No. 09-9093S

PRIMEBANK and
OYENS FEED & SUPPLY, INC.

    Defendants.

DECISION

In this adversary proceeding, Crooked Creek Corporation
(hereinafter "debtor") seeks a determination of the priority of
liens claimed against livestock sales proceeds by Primebank and
Oyens Feed & Supply, Inc.  Primebank claims a security interest
in the proceeds by virtue of perfected security agreements which
secure two promissory notes.  Oyens Feed & Supply, Inc.
(hereinafter "Oyens") claims an agricultural supply dealer's
lien in the proceeds pursuant to the provisions of Iowa Code
Chapter 570A and orders entered by this court.  Each creditor
asserts that its lien is paramount.  Primebank has filed
crossclaims against Oyens.  Its first such claim is to establish

the priority of its lien. Its second claim is to recover damages for the wrongful assertion of a lien against Primebank's collateral and for conversion of Primebank's collateral.

Pending before this court is Primebank's motion for partial summary adjudication on its crossclaim regarding the priority of its lien. Hearing on the motion was held in Sioux City on April 21, 2010. John O'Brien appeared as attorney for Primebank. A. Frank Baron appeared as attorney for Oyens. Although the debtor initiated this proceeding, it did not participate in the hearing. It has not taken a position as to which creditor's lien has priority; it asks only that the priority be determined so that it can perform its confirmed chapter 12 plan.

The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the District Court's order of reference. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2), made applicable by Fed.R.Bankr.P. 7056. As to the issue of lien priority, the parties agree that there is no genuine issue of material fact. Each asserts that priority can be determined by

2

construction of the Iowa statute creating the Agricultural

Supply Dealer Lien, Iowa Code Chapter 570A.

If Primebank's lien against the livestock proceeds is prior

to the lien of Oyens, then Oyens's claim against the debtor is

entirely unsecured.  If, however, the lien of Oyens is to any

extent prior to the lien of Primebank, the extent to which it is

superior would likely involve genuine issues of material fact,

and trial would be necessary.

Undisputed Facts

The parties agree that there is no genuine dispute as to

the following facts.  See Primebank's Statement of Material

Facts (doc. 22, ¶¶ 1-11) and their acceptance by Oyens (doc.

26).  The court will not quote Primebank's statement in its

entirety, but will set forth sufficient of the undisputed facts

to place in context the parties' arguments and the court's

reasoning in deciding the motion for partial summary

adjudication.  The court will add background facts which it

believes are undisputed.  Any such facts will be underlined.

Debtor is a farmer that conducted a farrow-to-finish

operation for the production of swine.  It is located in

Plymouth County, Iowa.  Debtor filed its chapter 12 petition on

August 18, 2009.  As of the filing date, debtor scheduled that

3

it owned and possessed 7,502 head of swine.  Primebank and Oyens
claimed conflicting liens on debtor's existing livestock (the
"disputed livestock").  On motion by the debtor, and pursuant to
order of this court, the disputed livestock was sold, and the
proceeds were deposited in a cash collateral account (the
"disputed livestock proceeds").  In accordance with a court-
approved agreement among debtor, Primebank, and Oyens, the
creditors' respective lien claims attached to the disputed
livestock proceeds in the same nature and priority as their
liens had attached to the disputed livestock.[1]  The three parties
subsequently agreed to reduce the amount of disputed livestock
proceeds in the cash collateral account to $358,841.10, the
amount necessary to satisfy Oyens's asserted secured claim (doc.
48); the stipulation was approved by the court (doc. 49).

Debtor is indebted to Primebank on two promissory notes,
one executed on September 19, 2008, in the original principal
amount of $1,100,000.00 and the second executed on January 28,
2009, in the original principal amount of $100,000.00.  The

---

[1] The court concludes that if Oyens had a valid agricultural lien on debtor's
livestock at the time of the filing of the bankruptcy petition, the lien was
effectively transferred to the proceeds created by the post-petition sales of
livestock.  The transfer was effectuated by the agreement of the parties and
the court's order approving the agreement.  The agreement and order preserved
the status quo in the bankruptcy case, notwithstanding that neither Iowa Code
Chapter 570A nor the Uniform Commercial Code appears to give an agricultural
supply dealer with a valid supply dealer lien a continuing lien in the
proceeds of crops or livestock.  See UCC § 9-322, comment 12, reprinted
following Iowa Code § 554.9322.

unpaid balance of the notes exceeds $1,000,000.00.  To secure

payment of the notes, debtor executed and delivered to Primebank

numerous security agreements including agreements dated November

18, 1997, December 24, 2001, and May 8, 2006.  In the

agreements, debtor granted Primebank a security interest in

property which included, but was not limited to, all inventory,

farm products, and livestock whether born or unborn.  The

security interest covered property then owned or later acquired.

The description of the collateral encompasses the disputed

livestock proceeds constituting the proceeds of the disputed

livestock.

Primebank's lien on the disputed livestock and the disputed

livestock proceeds was properly perfected by the filing of a

financing statement with the Iowa Secretary of State on November

24, 1997.  Subsequent filings by Primebank included amendments

to the financing statement and continuation statements.  The

notes and security agreements are in default.

Oyens admits that Primebank has a perfected security

interest in the disputed livestock proceeds at issue in this

case.  Primebank and Oyens agree that Oyens claims that it has

an agricultural supply dealer's lien which "attached" on May 28,

2009 (Primebank's Statement of Material Facts, doc. 22, ¶ 10).

The court analyzes the parties' agreement as to the date of "attachment" as follows.  Iowa Code Chapter 570A provides that an agricultural supply dealer's lien "becomes effective" at the time a farmer purchases the agricultural supply, and it becomes "perfected" upon the filing of a financing statement within a specific time after purchase.  Iowa Code § 570A.4(1), (2).[2]  In setting out its priority scheme, the statute calculates the extent of the priority for agricultural liens for livestock feed based on the time of "attachment" of the lien.  § 570A.5(3). Oyens filed its financing statement with the Secretary of State on May 28, 2009 (Oyens proof of claim, attachment).  The fact agreement that Oyens's lien "attached" on May 28, 2009 the court understands to mean that as of that date Oyens's agricultural supply dealer lien on livestock was effective and perfected. § 570A.4, Iowa Code § 554.9308(2).  Oyens's date of perfection is subsequent to the date of perfection of Primebank's security interest in the same collateral.

The undisputed facts stated by Primebank and accepted by Oyens included the following recitations:

Although Oyens Feed claims a Dealers Lien:

---

[2] Hereinafter all references to Chapter 570A and its sections are to the Iowa Code.

(a) Oyens Feed did not prepare or send, and the Bank did not receive a "certified request" as required by § 570A.2 and as defined by Iowa Code § 570A.1(4) [sic].

(b) Oyens Feed did not send, and the Bank did not receive any certified mailings from Oyens Feed as required by Iowa Code § 570A.2 and defined in Iowa Code § 570A.1(6).

(c) Oyens Feed did not send, and the Bank did not receive a Statement of "the amount of the purchase and terms of the sale" as required by § 570A.2(1) and which must be supplied by a trade creditor as a precondition to establishing a priority lien under Iowa Code § 570A.

(d) Oyens Feed did not send, and the Bank did not received [sic] "a waiver of confidentiality signed by the farmer" as required by § 570A.2(1).

(e) Oyens Feed did not send, and the Bank did not receive "a $15 fee" as required by Iowa Code § 570A.2(1).

(f) The Bank was not given any of the data required under Iowa Code § 590A(2) [sic] and (3) to decide whether to consent to a priority Dealer's lien for any specific or budgeted amount as required by Iowa Code § 590A.2(3) [sic].

(g) The Debtor never gave Oyens Feed an authenticated Security Agreement as that term is defined under the Iowa Commercial Code.

(h) Although Oyens Feed did not comply with the statute to obtain a dealer's lien, Oyens Feed filed a financing statement with the Iowa Secretary of State. However, Oyens Feed's Financing Statement concerning the Disputed Livestock Proceeds was filed with the Iowa Secretary of State after the Bank filed with the [sic] its Financing Statement concerning the Disputed Livestock Proceeds.

Primebank's Statement of Material Facts, doc. 22, ¶ 11(a)-(h).

## The Dispute

The court is asked to decide the priority of the two liens claimed against proceeds from the post-petition sale of debtor's livestock.  One lien is the Article 9 security interest of Primebank; the second is Oyens's agricultural supply dealer's lien, a statutory lien.

Primebank and Oyens each contend that its lien is superior to the other's, and each relies for the priority of its lien on provisions of Chapter 570A.  For the priority status of its Article 9 security interest, Primebank relies on § 570A.2(3); Oyens supports its position by contending that § 570A.5(3) is controlling, and that because Oyens supplied livestock feed, § 570A.2(3) has no application.

Neither party has stated that the statute's priority scheme is ambiguous.  However, each interprets the statute differently. Primebank argues that the statute provides it, as a financial institution, with an affirmative defense against the enforcement of an agricultural lien by a supply dealer who did not first serve it with a certified request, as Oyens failed to do. § 570A.2(3).  Oyens contends that § 570A.5, read in its entirety, must be interpreted as giving a special priority to agricultural liens for livestock feed, a priority treatment it

8

says is not susceptible to the affirmative defense provided in §
570A.2(3).

The court will consider whether the statute is ambiguous in
this regard.  The question is whether reasonable minds could be
uncertain as to the relationship between the affirmative defense
provided in § 570A.2(3) and the priority provided to feed
suppliers in § 570A.5(3).  See Carolan v. Hill, 553 N.W.2d 882,
887 (Iowa 1996) (citing Holiday Inns Franchising, Inc. v.
Branstad, 537 N.W.2d 724, 728 (Iowa 1995)).  As is argued by
Oyens, the affirmative defense provision in § 570A.2(3) is
stated as an exception to the equal priority status provided for
agricultural liens described in § 570A.5(2), but no such
exception is explicitly stated in the priority provided for feed
liens in § 570A.5(3).

The goal in interpreting a statute is to determine and give
effect to the legislature's intent.  Holiday Inns Franchising v.
Branstad, 537 N.W.2d at 728.  "[I]n order to ascertain the
legislature's intent, we look to the spirit of the statute as
well as the words and give a 'sensible, workable, practical, and
logical construction.'"  Id. (citing State v. Bartusek, 383
N.W.2d 582, 583 (Iowa 1986) (quoting Hansen v. State, 298 N.W.2d
263, 265-66 (Iowa 1980)).

9

"The interpretation of a statute requires an assessment of the statute in its entirety, not just isolated words or phrases." Schadendorf v. Snap-On Tools Corp., 757 N.W.2d 330, 337 (Iowa 2008) (citing State v. Young, 686 N.W.2d 182, 184-85 (Iowa 2004)). A court should interpret a statute so that no part of it is made irrelevant or superfluous. Schadendorf v. Snap-On Tools, 757 N.W.2d at 337; State v. Public Employment Relations Board, 744 N.W.2d 357, 361 (Iowa 2008). The court should not construe a statute in a way that would produce impractical or absurd results. Carolan v. Hill, 553 N.W.2d at 887. The court should not speculate as to the probable legislative intent apart from the wording used in the statute. Id.

A statute is considered as ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute. Id. at 887. Ambiguity can arise in two ways: (1) from the meaning of particular words; or (2) from the general scope and meaning of a statute when all its provisions are examined. Id.

Although, at first examination, Chapter 570A may seem confusing or contradictory regarding priorities, a reading of the entire statute, giving effect to its provisions as a whole, leads the court to the conclusion that it is a well organized scheme for the creation, perfection, priority and enforcement of

10

liens to secure the sale of agricultural supplies in Iowa.  The
court finds it is not ambiguous.

Having considered the undisputed facts of this proceeding
and having considered the Agricultural Supply Dealer Lien
statute, the court concludes that in order for Oyens to be
eligible to obtain either equal or priority status of its
agricultural supply dealer lien with or over the Article 9
security interest of Primebank, Oyens was first required to make
a certified request to Primebank.  Oyens admits that it did not
make such a request.  Therefore, Primebank's perfected Article 9
security interest is prior and superior to any agricultural lien
obtained by Oyens under the facts of this case.  Primebank's
motion for partial summary adjudication will be granted.


## Analysis

Chapter 570A establishes agricultural supply dealer liens
and provides for priority of such liens whether perfected or
unperfected.  The priority scheme involves the relationship of
the supply dealer's lien to other types of liens, including
other statutory liens and security interests created under
Article 9 of the Uniform Commercial Code (Iowa Code § 554.9101
et seq.).

There is no legislative history on the enactment of Chapter
570A (1984 Iowa Acts, Ch. 1072) or on subsequent amendments.  It
may be that the purpose of the Act was to aid financially
distressed farmers by providing some assurance of payment to
entities who provided them with certain supplies-—agricultural
chemicals, seed, feed, and petroleum products.  See Thomas E.
Salsbery & Gale E. Juhl,  Chapter 570A Crop and Livestock Lien
Law: A Panacea or Pandora's Box, 34 Drake L.Rev. 361, 363-64
(1984-85)(describing the law as a response to the "farm debt
crisis of recent years").  It may be also that the Iowa
Legislature intended to give some protection to Iowa's
agricultural supply dealers.  The statute provides protections,
too, for financial institutions whose security interests in a
farmer's crops or livestock may otherwise be adversely affected
by the creation and enforcement of the agricultural lien.

It appears that in attempting to deal with farm credit
problems, the legislature tried to strike a balance among the
various stakeholders -— farmers, financial institutions,
agricultural supply dealers, and other lienholders, including
the holders of statutory liens and creditors holding Article 9
security interests other than financial institutions.  The
statute does not treat the different stakeholders uniformly.

12

The court's analysis of Chapter 570A will be specific to the parties involved in the pending dispute.

An agricultural supply dealer that is considering selling a farm supply to a farmer on credit, may, prior to or upon the sale, make a certified request to a financial institution, including a bank, which has a security interest in collateral owned by the farmer.  Upon receipt of such a certified request, the financial institution "shall" issue, within four business days, a "memorandum which states whether or not the farmer has a sufficient net worth or line of credit to assure payment of the purchase price on the terms of the sale."   § 570A.2(1).  The certified request must state the amount of the purchase and terms of sale.  It must also be accompanied by a waiver of confidentiality signed by the farmer and a fee.  <u>Id.</u>

If the financial institution states in its memorandum that the farmer has sufficient net worth or line of credit to assure payment of the purchase price, the memorandum constitutes "an irrevocable and unconditional letter of credit" to the benefit of the dealer for a certain period.  § 570A.2(1).  The court will refer to such a statement by the financial institution as a "positive assessment" of the farmer's financial condition.

The financial institution may issue a memorandum that does not state that the farmer has sufficient net worth or line of

13

credit to assure payment of the purchase or expressly states
that he does not.  The court will refer to each such response,
whether made by omission or expressly, as a "negative
assessment."  If that is the circumstance, the financial
institution is required to transmit to the dealer the relevant
financial history that it holds on the farmer.  Id.  The
financial history "means the record of a person's current loans,
the date of a person's loans, the amount of the loans, the
person's payment record on the loans, current liens against the
person's property, and the person's most recent financial
statement." § 570A.1(9).  Without a positive assessment and its
resulting letter of credit, the agricultural supply dealer is
left to make its own decision on the credit sale, but at least
in doing so, it has been provided with what the legislature
deemed sufficient information.

     If within the four business day period, the financial
institution fails to issue the memorandum, or the memorandum is
incomplete, or the institution issues a memorandum which
constitues a negative assessment, the agricultural supply dealer
may nonetheless make the credit sale and secure the purchase
price with an agricultural lien.  § 570A.2(2).

     An agricultural lien is created under § 570A.3.  It is also
defined in Article 9 of the Uniform Commercial Code, as adopted

14

in Iowa.  Iowa Code § 554.9102(e).  The amount of the lien is
for the amount owed to the dealer for the retail cost of the
agricultural supply, including labor.  § 570A.3.  The lien
applies to crops causally related to the purchased supply.
§ 570A.3(1).  The lien also applies to livestock consuming feed
sold to the farmer by the dealer.  § 570A.3(2).  The lien is
"effective" at the time of the purchase, and is perfected by the
filing of a financing statement with the Iowa Secretary of State
within 31 days of the purchase.  § 570A.4.  See also Iowa Code
§§ 554.9308(2) (allowing dealer to satisfy perfection
requirements prior to lien becoming effective), 554.9310(1)
(requiring filing to perfect agricultural lien).  The
requirements for the financing statement are governed by Article
9, Part 5, of the Uniform Commercial Code as adopted in Iowa.
Iowa Code §§ 554.9501-554.9527.

    Primebank has argued that there can be no agricultural
supply dealer lien without a prior certified request.  The court
disagrees.  The court's reading of the statute is that an
agricultural supply dealer lien may be created (or made
effective) and perfected by a dealer without the requirement
that the dealer first make a certified request to a financial
institution, much less any other lien creditor.  The existence

15

of an agricultural supply dealer lien is independent of any

requirement of a certified request.

However, if an agricultural supply dealer proceeds with an

action against the interest of a financial institution to

enforce a lien secured under § 570A.3,

> it shall be an affirmative defense to a financial
> institution and complete proof of the superior
> priority of the financial institution's lien that the
> financial institution either did not receive a
> certified request and a waiver signed by the farmer,
> or received the request and a waiver signed by the
> farmer and provided the full and complete relevant
> financial history which it held on the farmer making
> the purchase from the agricultural supply dealer on
> which the lien is based and that financial history
> reasonably indicated that the farmer did not have a
> sufficient net worth or line of credit to assure
> payment of the purchase price.

Section 570A.2(3) (emphasis added).

The priority status of an agricultural supply dealer lien

is governed by Iowa Code §§ 554.9317 and 554.9322.  Section

554.9317 provides the general rule that liens have priority in

the same order as the time of their perfection.  Pursuant to §

554.9322(7), "[a] perfected agricultural lien on collateral has

priority over a conflicting security interest in or agricultural

lien on the same collateral if the statute creating the

agricultural lien so provides."

This brings us to the rules of priority stated in § 570A.5,

which will be quoted in its entirety.

16

570A.5. Priority of lien

Except as provided in this section, an agricultural supply dealer lien that is effective or perfected as provided in section 570A.4 shall be subject to the rules of priority as provided in section 554.9322. For an agricultural supply dealer lien that is perfected under section 570A.4, all of the following shall apply:

1. The lien shall have priority over a lien or security interest that applies subsequent to the time that the agricultural supply dealer lien is perfected.

2. Except as provided in section 570A.2, subsection 3, the lien shall have equal priority to a lien or security interest which is perfected prior to the time that the agricultural supply dealer lien is perfected. However, a landlord's lien that is perfected pursuant to section 570.1 shall have priority over a conflicting agricultural supply dealer lien as provided in section 570.1, and a harvester's lien that is perfected pursuant to section 571.3 shall have priority over a conflicting agricultural supply dealer lien as provided in section 571.3A.

3. A lien in livestock feed shall have priority over an earlier perfected lien or security interest to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater.

Section 570A.5(2) provides that the perfected lien of an agricultural supply dealer shall have <u>equal</u> priority with a lien or security interest that is perfected prior to the time that the agricultural supply lien is perfected.  There are exceptions for certain other statutory liens which are not relevant here. This statement of equal priority applies to all perfected agricultural supply dealer liens, not only to agricultural

17

supply dealer liens on crops.  Oyens argues that § 570A.5(2)
applies only to agricultural supply dealer liens against crops.
However, there is nothing in the section that indicates that
this is so.

The equal status priority provided to agricultural supply
dealer liens under § 570A.5(2) has an exception regarding
financial institutions —- the agricultural lien shall have equal
priority to a prior perfected security interest "except as
provided in section 570A.2(3)."

The exception makes applicable the affirmative defense and
complete proof provisions when the agricultural lien is sought
to be enforced against a financial institution.  But these
provisions apply only under narrow circumstances.  The provision
is available only to a financial institution.  It is available
to such institution under only two circumstances.  One is that
the institution did not receive a certified request from the
agricultural supply dealer seeking to enforce the lien, which
request was accompanied by the waiver of confidentiality and a
fee, and two, the institution received the certified request and
waiver, and

> provided the full and complete relevant financial
> history which it held on the farmer making the
> purchase from the agricultural supply dealer on which
> the lien is based and that financial history
> reasonably indicated that the farmer did not have a

18

sufficient net worth or line of credit to assure
payment of the purchase.

Section 570A.2(3).

The statute requires the agricultural supply dealer
considering a credit sale to a farmer to provide information to
a financial institution with a prior lien and to submit a waiver
of confidentiality so that the institution may respond and may
provide the relevant financial history to the dealer.  If the
institution provides a positive assessment, it stands as an
irrevocable letter of credit to the dealer for the credit
purchase.  But the institution might fail to respond, respond
incompletely, or give a negative assessment of the farmer's
financial condition.  In those circumstances, the agricultural
supply dealer may make the credit sale, and obtain equal status
with the lien of the institution, BUT ONLY IF, pertaining to a
negative assessment, no relevant and probative financial history
on the farmer was provided with the negative assessment.  Thus,
if the agricultural supply dealer is left twisting in the wind
for relevant information, its lien receives equal priority
status with the lien of the financial institution.

It is only when a financial institution, upon receiving a
certified request, gives a negative assessment supported with
the relevant financial history, that the agricultural supply
dealer's lien is subject to the affirmative defense and the

19

complete proof that the institution has a superior lien.  But, the relevant financial history must reasonably indicate that the farmer does not have sufficient net worth or line of credit to assure payment of the credit sale by the agricultural supply dealer.

In balancing the rights of a financial institution with the needs of a farmer and the desire of an agricultural supply dealer to be paid for its sale of goods, the statute requires detailed disclosures by all parties.  If the agricultural supply dealer receives a financial history that supports a negative assessment, one that indicates there can be no assurance of payment for the sale, the dealer can protect itself by declining to enter into the credit transaction with the farmer.  However, if the institution does not respond or does not supply the relevant financial history to support a negative assessment of the farmer's ability to pay, then the dealer may make the credit sale and receive equal priority status with the institution.

In this statutory scheme, if the agricultural supply dealer is proposing a credit sale of feed, the same circumstances apply, but the dealer may obtain not merely equal lien status, but rather priority over the financial institution's security interest.  The agricultural supply dealer proposing to make a credit sale of feed to the farmer must still make a certified

20

request in order to have the opportunity to obtain a priority
lien over the institution's earlier perfected security interest
in livestock.  The court interprets the statute to create the
same requirements for agricultural supply dealers selling crop
inputs as for dealers selling livestock feed.  However, to the
extent the feed dealer complies with the statute and the
financial institution does not, the feed dealer obtains a
priority lien.

Oyens interprets the statute differently.  It argues that §
570A.5(3) is an independent provision giving agricultural supply
dealers with perfected agricultural liens for sales of livestock
feed priority over the earlier perfected security interests held
by financial institutions, without imposing any prior
obligations on the dealer.  Oyens justifies this priority
because livestock will die if not fed, and it supports its
interpretation by pointing out that the § 570A.2(3) exception to
the equal status of agricultural liens under § 570A.5(2) is not
stated in § 570A.5(3).  It contends that § 570A.5(2) deals
solely with crop liens, and § 570A.5(3) deals solely with feed
liens.

Nothing in the court's reading of the two subsections
persuades it that § 570A.5(2) does not apply to perfected liens
for all agricultural supplies.  Indeed, the language of § 570A.5

21

itself supports an interpretation of the section which makes the
requirements of § 570A.5(2) applicable to liens for feed.  The
section provides that "[f]or an agricultural supply dealer lien
that is perfected under section 570A.4, <u>all of the following</u>
<u>shall apply . . ."</u> (emphasis added), and the phrase is followed
by the three priority subsections (570A.5(1), (2), and (3)).
Oyens's interpretation of the section ignores the language
making subsection 570A.5(2) applicable to perfected agricultural
supply liens for livestock feed.  Moreover, the fact that
subsection 570A.5(3) deals with elevated treatment only for
livestock feed liens does not mean that subsection 570A.5(2)
does not also give livestock liens equal priority status with
other liens.  This is so because there is nothing in § 570A.5
which seems to prevent an agricultural supply dealer's lien for
livestock feed from obtaining equal status with the financial
institution in some amount, and yet priority status to the
extent provided by the formula in § 570A.5(3).  Interpreting
subsection 570A.5(2) to apply to livestock feed liens, including
the exception of § 570A.2(3), gives meaning and relevancy to all
the words of the statute.  Oyens's reading makes irrelevant the
language of the statute that makes the special priority rules
applicable to all perfected agricultural supply liens.

Moreover, Oyens's interpretation of the statute would seem
not to achieve the purpose of the statute and, in the court's
view, it would lead to an absurd result.  Its interpretation
would require agricultural supply dealers selling crop inputs to
make a certified request to financial institutions, giving the
required information on the sale, before they could obtain equal
priority status of their liens.  And they risk not obtaining
such status if they ignore or fail to properly evaluate the
farmer's financial history.  Concomitantly, the financial
institution must provide the relevant financial history on the
farmer in order to preserve the priority of its security
interest.

On the other hand, Oyens's interpretation of § 570A.5(3),
as an independently applicable priority rule, results in an
agricultural supply dealer obtaining a priority lien for feed
ahead of a prior perfected security interest of a financial
institution without making any certified request or providing
any information on the sale to the institution and without the
dealer's evaluating the farmer's ability to assure payment from
the institution's financial history of the farmer.  The result
of its interpretation might well be that the dealer would
receive priority status of its feed supply lien over the earlier
perfected security interest of the financial institution despite

23

the farmer's obvious inability to assure payment for the feed.

Thus ignoring the scheme otherwise established by the statute,

the feed supplier ends up forcing upon the financial institution

an involuntary loan to the farmer for the amount of the supply

dealer's lien, and the dealer receives this benefit by ignoring

the statute's obvious intent that the parties exchange

information prior to the supply dealer's credit sale.  For

agricultural supply dealer liens for livestock feed, this stands

the statute on its head, and leads to an absurd result.  The

court's construction of the statute gives proper weight to all

sections of the statute, providing a reasonable interpretation

to the statute as a whole.

The court's interpretation of the statute is supported also

by a decision of the Iowa Supreme Court.  In the case of Wilkin

Elevator v. Bennett State Bank, 522 N.W.2d 57 (Iowa 1994), the

elevator brought several claims against the bank after the

elevator had not been paid for supplying hog feed to a married

farm couple who were bank borrowers.  The farmers were in

default to the bank on their loan obligations which were secured

by the farmers' hogs.  They agreed to transfer substantial

assets, including most of their hogs, to the bank in

satisfaction of debt.  The farmers later filed bankruptcy.

Their debt to the elevator for hog feed was discharged and not
paid.

The elevator brought an action against the bank for breach
of an alleged agreement assuring payment to the elevator for its
sales of feed; for tortious interference with a contract between
the farmers and the elevator; for an alleged improper transfer
of assets from farmers to the bank in satisfaction of debt; and
also to claim superior rights to checks being held by bank as a
result of hog sales to third parties (which third parties had
made their checks payable to bank, farmers, and the elevator).

As to at least two of the elevator's claims (tortious
interference and the claim of a prior lien in the hog checks),
the existence of bank's lien rights were put at issue.  The
elevator had claimed that bank's lien rights had been waived or
compromised.  The Iowa Supreme Court determined that bank had
the legal right to protect its interest in the farmers' assets
and to receive their transfer in satisfaction.  The court found
it relevant that the elevator was a general, unsecured creditor
of the farmers.  It stated that "[b]ecause the [elevator] at no
time had any lien on the [farmers'] hogs or any of the other
assets that were transferred to the bank, it has no basis to
challenge the bank's action with respect to the collateral."

<u>Wilkin Elevator v. Bennett State Bank</u>, 522 N.W.2d at 62.  The

court, in a footnote to that conclusion stated:

> The feed store never tried to obtain a security
> interest on the [farmers'] livestock or other assets
> until August of 1991, when it attempted to perfect a
> lien under the provisions of Iowa Code § 570A.3
> (1991).  <u>Any lien under that statute was ineffective</u>
> <u>as against the bank, however, because of the feed</u>
> <u>store's failure to provide the bank with the required</u>
> <u>documentation.  Iowa Code § 570A.2(3) (1991).</u>

<u>Id.</u> at 62 n.3 (emphasis added).  The court concluded also that

because bank did have a lien in the farmers' hogs, and the

elevator did not, bank was entitled to the third party checks

for the sale of hogs.  <u>Id.</u> at 63.

    Because of the failure of Oyens to make a certified request

to Primebank pursuant to Iowa Code § 570A.2 regarding Oyens's

credit sale of livestock feed to Crooked Creek Corp., the

security interest of Primebank in the livestock and livestock

sales proceeds is prior to the agricultural supply dealer lien

of Oyens for the amount owed to Oyens for the retail cost of the

feed.

    IT IS ORDERED that the motion for partial summary

adjudication filed by Primebank is granted.  Upon final

judgment, it shall be ordered, adjudged, and decreed that the

security interest of Primebank in the disputed livestock

proceeds owned by Crooked Creek Corp. is prior and superior to

the agricultural supply dealer's lien of Oyens Feed & Supply,

Inc.

    DATED AND ENTERED  <u>May 7, 2010</u>

                  William L. Edmonds, Bankruptcy Judge