# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | **Chapter 12** |
| **CROOKED CREEK CORP,** ) | |
| ) | **Bankruptcy No. 09-02352S** |
| Debtor. ) | |
| ) | |
| **CROOKED CREEK CORP.,** ) | |
| ) | |
| Plaintiff, ) | **Adversary No. 09-9093** |
| ) | |
| v. ) | |
| ) | |
| **PRIMEBANK and** ) | |
| **OYENS FEED & SUPPLY INC.** ) | |
| ) | |
| Defendants. ) | |

## MEMORANDOM AND ORDER

Crooked Creek Corporation ("Debtor") brought this adversary proceeding to determine lien priority between Primebank and Oyens Feed & Supply, Inc. ("Oyens") against livestock sale proceeds. Primebank claims a secured interest in the proceeds based on perfected security agreements for two promissory notes. Oyens claims an agricultural supply dealer's lien on the proceeds under Iowa Code Chapter 570A. Debtor does not take a position on which lien has priority to the sale proceeds and did not participate in the majority of this adversary. Trial was on April 23, 2014 in Sioux City, Iowa. Joel Vos represented Oyens. Scott Sandberg

represented Primebank. After trial, the Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

## STATEMENT OF THE CASE

Debtor filed for Chapter 12 bankruptcy on August 18, 2009. Debtor is a farmer that conducted farrow-to-finish operations for swine production. Oyens is a feed supplier. Primebank is a traditional lender. They are both creditors of Debtor.

Debtor filed this adversary proceeding to determine which lien has priority in hog-sale proceeds. Oyens filed an answer asserting that its lien had priority as a statutory lien under Iowa Code Chapter 570A, which gives priority status to agricultural feed suppliers. Primebank filed a cross-claim asserting that its lien had priority in the hogs.

On Debtor's motion, and pursuant to this Court's order, the disputed livestock was sold, and the proceeds were deposited in a cash collateral account. Those proceeds are insufficient to satisfy both parties' liens. Under the Court order, the creditors' respective lien claims attached to the proceeds in the same nature and priority as their liens attached to the hogs. Because Debtor needed cash collateral, the parties agreed to allow Debtor to use some of the sale proceeds as cash collateral as long as Debtor left $358,841.10 in the account, which represented the maximum amount necessary to satisfy Oyens' asserted claim. The proceeds are currently in escrow.

2

Primebank moved for partial summary judgment on its declaratory relief claim, asserting that Oyens is not entitled to superpriority under Iowa Code § 570A.5(3) because it did not comply with the certified request process in Iowa Code § 570A.2. Oyens resisted the partial summary judgment by arguing that §570A.5(3) operates independently of § 570A.2. The Court granted Primebank's Motion for Partial Summary Judgment. Oyens appealed to the District Court, which certified the question to the Iowa Supreme Court. The Iowa Supreme Court answered a certified question of law resolving the conflict between the liens in the statutory structure. It determined that Primebank's lien was superior insofar as it covered the purchase price of the hogs, but that Oyens had priority on increases in the hogs' value from acquisition price to final sale. Oyens Feed & Supply Co. v. Primebank, 808 N.W.2d 186, 194 (Iowa 2011). In light of the Iowa Supreme Court's answer to the certified question, the only question left for trial was the portion of the escrow funds each creditor should be awarded. After holding the trial, and carefully reviewing the record, the Court concludes that Oyens has a superpriority claim for $156,367.43 and an unsecured claim for $186,004.35. Primebank's secured claim is limited to $315,270.19.

## STATEMENT OF FACTS

Debtor is a farrow-to-finish hog operation. Debtor did not purchase any outside swine—Debtor raised replacement gilts rather than purchasing them.

3

Oyens provided Debtor's sole source of hog feed. Oyens also provided Debtor with management services, including inventorying and monitoring the hogs and preparing budgets. Although Oyens tracked Debtor's inventory, most of those records have been lost for the relevant periods here. Parties disagree about the amounts of their respective claims. The Court's findings of fact are expressed below.

Debtor is indebted to both Primebank and Oyens Feed. Oyens provided the Court with a total amount that Debtor still owed to Oyens. After a careful review of the record, the Court concludes that Debtor owes $342,371.78 to Oyens for unpaid feed: $45,927.22 is for feed delivered from April 27, 2009 to May 28, 2009 and $110,440.21 is for feed delivered from July 14, 2009 to August 14, 2009. Debtor also owes Oyens for yardage and veterinary services of $16,570.00.

Originally, Debtor owed Primebank roughly $1.2 million on two promissory notes. Debtor executed the first promissory note on September 19, 2008 for $1.1 million at 5% interest. Debtor executed the second note January 28, 2009 for $100,000.00 at 6% interest. Debtor's President and his wife, Ricke and Marian Langel (the "Langels"), personally guaranteed these promissory notes. The Langels also personally owed Primebank just under $2.2 million.

In 2009, the Langels and Primebank engaged in negotiations to refinance both their personal debt and their guarantor debt. These negotiations led to three

promissory notes that were executed in December 2009. The face amount on the first loan ("Loan 1") was for $2.2 million at 4% interest, where $2,007,148.12 was attributed to the Langels personally and $192,851.88 was attributed to Debtor. The second loan's ("Loan 2") face value was stated on the promissory note as $575,000.00. Later correspondence with the loan officer, Ross Harden, indicates that the actual amount of the loan is $565,818.00 at 0% interest. In Loan 2, $150,559.38 was attributed to the Langels personally and $415,258.62 was attributed to Debtor. The third loan ("Loan 3") was originally for $600,000 at 0% interest, which was held in a cash collateral account at Primebank. Loan 3 was not technically funded to the Langels because it sits in escrow awaiting this decision. Loan 3 also provided that $50,000.00 will be paid toward guarantor obligations if Primebank does not recover the full amount of the disputed proceeds here. The Langels deposited that $50,000 in a Primebank account under their name alone.

When Debtor refinanced as of December 29, 2009, it still owed Primebank $921,312.81. A cash advance of $2,067.88 on January 5, 2010 increased that debt to $923,380.69. On January 3, 201, Debtor applied $192,821.88 to this debt from the Langel's personal loan account. On or around May 24, 2012, Debtor received $215,258.62 from the sale of real estate collateral and applied that amount to the Primebank debt. In September 2012, Primebank wrote off $200,000 of Debtor's debt. Without considering the $50,000 cash reserve payment, Debtor still owes

5

Primebank $315,270.19.

Both creditors have perfected their respective liens in the livestock proceeds. Primebank perfected its secured position in 1997 with a standard Article 9 "blanket lien," which includes Debtor's hogs. Primebank properly renewed its interest in 2002 and 2007. Oyens filed financing statements on May 28, 2009 and August 14, 2009 to perfect a lien for Debtor's feed purchases. The Court must decide how much each party will receive of the $358,841.10 that sits in escrow.

## DISCUSSION

Debtor owes Oyens $358,841.10 for feed. Oyens argues that, to the extent that it properly perfected its interest, it has a superpriority under Iowa Code § 570A.5(3). Primebank disputes Oyens claim because Oyens cannot show the "difference between the acquisition price of the livestock and the farm market value at the time the lien attaches or the sale price of the livestock" as required by Iowa Code § 570A.5(3). Primebank believes that because Oyens cannot show an acquisition price, then Oyens cannot have a superpriority.

### I. The Acquisition Price

Oyens argues that the acquisition price of the hogs is $0 because Debtor raises its own hogs instead of purchasing them. Primebank argues that the acquisition price is the cost to produce each hog—facility maintenance costs, electricity, vet bills, semen, wages, expenses for the gilt, etc.

6

Iowa Code § 570A.5(3) provides:

> A lien in livestock shall have priority over an earlier perfected lien or security interest to the extent of the **difference between the acquisition price** of the livestock **and the fair market value of the livestock** at the time the lien attaches or the sale price of the livestock, whichever is greater.

Iowa Code § 570A.5(3) (2014) (emphasis added). Neither Iowa Code Chapter 570A nor the Iowa Supreme Court defines "acquisition price" as used in this statute. See id. § 570A.1; Oyens Feed & Supply, Inc. v. Primebank, 808 N.W.2d 186 (Iowa 2011); see also First Nat'l Bank of Omaha v. Farmers Coop. Society (In re Coastal Plains Pork, LLC), Bankr. No. 09-08367-8-RDD, Adv. No. 09-00214-8-RDD, 2012 WL 6571102 (Bankr. E.D.N.C. December 12, 2012) (discussing Oyens Feed as it applies to determining acquisition price).

Iowa courts will not use statutory construction rules "when the language of a statute is 'so clear and free from obscurity that its meaning is evident from a mere reading.'" Holiday Inns Franchising, Inc. V. Branstad, 537 N.W.2d 724, 728 (Iowa 1995). Where there is no statutory definition, words in the statute are interpreted using "their ordinary and common meaning by considering the context within which they are used." Auen v. Alcoholic Beverages Div., Iowa Dep't of Commerce, 5679 N.W.2d 586, 590 (Iowa 2004). Further, the court "will search for an alternative meaning if adherence to the strict letter of the law would lead to an unreasonable, unjust, impracticable, or absurd outcome." Holiday Inns Franchising, Inc., 537 N.W.2d at 728. A court must interpret the statute in such a

7

way as to support the legislature's intent. Id. "In order to arrive at a reasonable construction which will best affect rather than defeat the legislative purpose, we consider the following: (1) the language of the statute; (2) the objects sought to be accomplished; and (3) the evils sought to be remedied." Id.

In Oyens, the Iowa Supreme Court stated that "[t]he feed supplier's superpriority corresponds to the livestock's increase in value that typically results from consuming feed." Oyens Feed, 808 N.W.2d at 195. That court further noted that "commentators suggest the legislature intended the lien to encourage the credit sale of agricultural supplies by providing the supplier a secured lien in the farmers' crops or livestock." Id. at 189. Chapter 570A was likely a compromise between agricultural supply dealers and financial institutions because both are afforded some protections. See Oyens Feed, 808 N.W.2d at 189; Wells Fargo Bank v. Tama Benton Coop. (In re Shulista), 451 B.R. 867, 873 (Bankr. N.D. Iowa 2011) (discussing Crooked Creek Corp v. Primebank, (In re Crooked Creek Corp.), 427 B.R. 500 (Bankr. N.D. Iowa 2010), overruled on other grounds by Oyens Feed, 808 N.W.2d 186).

It is undisputed that Debtor does not purchase any outside hogs. All of the hogs sold are born and raised at its facility. This Court finds that the "purchase price" comprises the vast majority, if not all of, the "acquisition price" for the

8

purposes of Iowa Code § 570A.5(3).[1] Here, the "purchase price" is zero because the hogs were not purchased. Without a purchase price, the "acquisition price" also appears to be zero.

Primebank, however, argues that the acquisition price should include every cost in the facility that contributes to producing the hogs. This definition of "acquisition price" is impractical and does not fit this statute. Applying this definition would require feed suppliers to track virtually all of the hog facility's expenses—from semen costs to building depreciation—and assign an amount of each to every hog. It would require the feed supplier to attempt to assign long term costs to an unknown, if not unknowable, quantity of hogs that would be produced over the useful life of the long-term costs. Further, this result would significantly blur the line between overhead costs and acquisition price, so much that they seem to merge together. At a minimum, it would present hog suppliers with an accounting burden—in time and costs—that would be prohibitive.

In addition, Primebank's definition cannot be correct if the legislature intended to provide feed suppliers with extra protections to encourage them to continue dealing with troubled farmers. Although Primebank claims its definition would have a relatively simply end calculation—add all of the hog reproduction

---

[1] See First Nat'l Bank of Omaha v. Farmers Coop. Society (In re Coastal Plains Pork, LLC), 2012 WL 6571102, fn. 13, Bankr. No. 09-08367-8-RDD, Adv. No. 09-00214-8-RDD (Bankr. E.D.N.C. December 12, 2012) (expressing concern about the feasibility of the 570A.5(3) formula in more complicated situations).

expenses together and divide by the number of hogs born during that period—the record-keeping required to get that calculation would be extremely complicated. This Court cannot conclude that the Iowa Legislature intended that feed suppliers engage in this elaborate process to determine the amount of their superpriority. Feed suppliers are already limited by a 31-day filing period; it seems contrary to legislative intent to make obtaining a superpriority even more difficult.

Oyens argues that the definition of acquisition price where the hogs are born in the facility is $0. The Court agrees. The hogs were not purchased and the alternative definition produces an "an unreasonable, unjust, impractical, or absurd outcome." Holiday Inns Franchising, Inc., 537 N.W.2d at 728.

**II. Oyens' Lien Perfection**

After considering the Court's decisions in two related cases—Schley v. Peoples Bank (In re Schley), 509 B.R. 901 (Bankr. N.D. Iowa 2014) and Farmers Coop Co. v. Ernst & Young, Inc. (In re Big Sky Farmers Inc.), 512 B.R. 212 (Bankr. N.D. Iowa 2014)—Oyens asserts that its secured interest in the feed purchases is limited to the two 31-day periods when its interest was perfected. Primebank seems to agree with this contention, but disagrees as to the final amount. Primebank argues that the amount perfected should be limited to the difference between the debt at the beginning of the period and the debt at the end of the period. This argument assumes that all payments received would apply to

all feed supplied during that period.  However, Iowa law does not support Primebank's argument.

Under Iowa law, a feed supplier can only have a superpriority where it perfected its interest in the delivered feed.  Iowa Code § 570A.4(2) (2014).  A feed supplier perfects its interest by filing a financing statement with the secretary of state.  Id. § 570A.4(2).  The perfection period reaches back 31 days from the date of the filing.  Wells Fargo Bank v. Tama Benton Coop. (In re Shulista), 451 B.R. 867, 873 (Bankr. N.D. Iowa 2011).  A lien under 570A becomes effective when the farmer purchases the supply.  Iowa Code § 570A.4(1).  Further, Iowa law allows creditors to apply payments to first-incurred debt.  Johnson v. Foster, 101 N.W. 741, 742 (Iowa 1904).

Oyens filed financing statements on May 28, 2009 and August 14, 2009 to perfect feed purchases.  Oyens delivered feed valued at $45,927.22 from April 27, 2009 to May 28, 2009 and feed valued at $110,440.21 from July 14, 2009 to August 14, 2009.  Therefore, Oyens has a superpriority as to $156,367.43.  Oyens also has an unsecured claim for unpaid feed in the amount of $186,004.35.

Oyens is within its rights to apply any amounts paid during the perfection period to outstanding debt.  The lien became effective when Debtor purchased the feed in that period regardless of any payment applied to the outstanding debt.  The

11

difference between the total amount of debt at the beginning and end of each period is irrelevant.

### III. Sanctions

There is also a pending Motion for Sanctions filed by Oyens against Primebank and its counsel. The Court intended to decide that issue with this case. However, since the trial concluded, the United States District Court for the Northern District of Iowa has issued a significant sanction decision. <u>Security Nat'l Bank of Sioux City, Iowa v. Abbott Lab.</u>, 299 F.R.D. 595 (N.D. Iowa 2014). The Court will hold a hearing on the effect of that case on the Motion for Sanction and invites pre-hearing briefing.

### CONCLUSION

For the reasons stated above, the Court concludes that Oyens has a superpriority claim for $156,367.43 and an unsecured claim for $186,004.35. Debtor's unpaid yardage and vet fees of $16,570.00 are in addition to Oyens' unsecured claim for feed supplied, bringing the total unsecured claim to $202,574.35. Primebank's secured claim is limited to $315,270.19.

**WHEREFORE**, Oyens will receive $156,367.43 of the escrowed funds, and Primebank will receive the remainder.

**FURTHER**, judgement shall enter accordingly.

Dated and Entered: October 21, 2014

_____
**THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE**